IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**DIANA M. DAVIS,**

     Plaintiff,

     v.

**MICHAEL J. ASTRUE**, **Commissioner**
**of Social Security,**

     Defendant.

Case No. CV 10-742-SI

**OPINION AND ORDER**

Merrill Schneider
Schneider Law Offices
P.O. Box 14490
Portland, Oregon 97293
     Attorney for plaintiff

Amanda Marshall
United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Nancy Mishalanie
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
     Attorneys for defendant

Opinion and Order, Page 1

SIMON, District Judge:

## I. INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Diana M. Davis for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § § 401-33, and Supplemental Security Income ("SSI") payments under Title XVI of the Act, 42 U.S.C. §§ 1381-83f. Ms. Davis alleges disability on the basis of bone disease, depression, and alcoholism.

Ms. Davis asserts that the Commissioner erred in the following ways: (1) at step three of the sequential analysis, failing either to analyze properly the question of whether Ms. Davis met or equaled a listed impairment or to obtain an updated opinion from a medical expert; (2)  failing to give the evidentiary weight of a medical opinion to the opinions of Jessica Black, a naturopath; (3) failing to provide clear and convincing reasons for adverse credibility findings on the testimony of Ms. Davis; and (4) at step five of the sequential analysis, accepting testimony of the Vocational Expert ("VE") that deviated from the *Dictionary of Occupational Titles* ("DOT") without a reasonable explanation, accepting testimony from the VE that was inconsistent with the ALJ's residual functional capacity ("RFC") finding that Ms. Davis was limited to unskilled work, and accepting testimony from the VE on the availability of jobs that was unsupported by the evidence. Ms. Davis asks that the Commissioner's decision be reversed and the case remanded for further administrative proceedings. For the reasons that follow, the court reverses the Commissioner's decision and remands the case for further administrative proceedings at step five of the sequential analysis.

## II. BACKGROUND

Ms. Davis filed an application for SSI on September 30, 2004, and an application for DIB on October 6, 2004, alleging an onset date of September 30, 2001, for each application. Her application was denied initially and upon reconsideration. A hearing was held on April 14, 2008, before Administrative Law Judge ("ALJ") Marilyn Mauer. Ms. Davis, VE Kay Wise, and two of Ms. Davis's friends testified. On June 25, 2008, the ALJ issued a decision finding Ms. Davis not disabled. When the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision.

Born in 1963, Ms Davis was 45 years old at the time of the ALJ's decision. Her date last insured is June 30, 2005.[1] Ms. Davis has not engaged in substantial gainful activity since the alleged onset date, September 30, 2001. Her past relevant work is as a prep cook.

### A.    Medical Evidence

Ms. Davis has dyschondrosteosis, also known as Leri Weill dyschondrosteosis, a genetic disorder characterized by short stature and an abnormality of the wrist bones called Madelung deformity. National Institutes of Health Genetic and Rare Diseases Information Center, http://rarediseases.info.nih.gov/GARD/Condition/3224/Leri_Weill_dyschondrosteosis.aspx. She is four feet eight inches tall. Tr. 277. Ms. Davis was treated at the Sheridan Medical Center between October 17, 2003 and March 1, 2005, for complaints of intermittent pain in her feet and legs and depression, for which she was prescribed Effexor and Zoloft. Tr. 268, 272, 275.

---

[1]In a DIB case, the claimant must prove that the current disability began on or before the date last insured. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

On March 1, 2005, Ms. Davis was examined by Nathan Magaret, M.D. Tr. 276. Ms. Davis's primary complaint was pain in her legs, ankles and feet, exacerbated by cold weather. *Id.* Upon examination, Dr. Magaret noted significantly shortened upper extremities and thickening of the bones. Tr. 279.  Coordination, station, and gait were normal. Tr. 278. Dr. Magaret was unable to reproduce any tenderness along the femur, knee, or ankle, and Ms. Davis was capable of full range of motion throughout all extremities without pain. Tr. 279. Muscle strength, bulk, tone, reflexes, and sensory examination were normal throughout the extremities. *Id.* Dr. Magaret diagnosed chronic bilateral leg and foot pain, but thought more information about her bone disease would be helpful. *Id.*

Dr. Magaret wrote that Ms. Davis had disclosed a longstanding history of alcohol dependence and problems with alcohol-related issues, but that she had been sober for 10 months and was attending Alcoholics Anonymous ("AA") meetings regularly. *Id.* Ms. Davis also related that she had a history of depression, but Dr. Magaret thought it seemed well controlled by medication and sobriety. *Id.* In Dr. Magaret's opinion, Ms. Davis was capable of standing and walking for six hours out of an eight-hour workday and carrying 20 pounds occasionally and 10 pounds frequently, but was limited in her ability to reach above her head, because of her short stature and shortened extremities. Tr. 280.

Ms. Davis had a psychodiagnostic evaluation on March 2, 2005, by Gregory Cole, Ph.D. Tr. 281. In addition to a clinical interview and behavioral observations, Dr. Cole administered portions of the Wechsler Memory Scale-Immediate and Delayed Memory, and the Beck Depression Inventory-II. Ms. Davis's medical records were not available for review. *Id.* Ms. Davis told Dr. Cole that she was treated for depression in 2003, but that this had been her

last mental health contact. Tr. 281. She said she had never been psychiatrically hospitalized, but that she had made four suicide attempts during her lifetime. *Id.* Her last job had been as a clerk at a Circle K store for three months, in 2002. Tr. 282. She quit the job because of depression. *Id.* In 1998 and 1999, she worked full-time as a chef's assistant at a country club, but was fired for drinking. *Id.* Her current medications were the antidepressants Effexor and trazodone; tramadol for pain relief; and hydroxyzine, an anti-histamine. Tr. 283.

Ms. Davis reported that although she felt "down" on some days, "mostly I have felt OK as of late." She reported that her energy level and her ability to concentrate were diminished, but she had no feelings of hopelessness or ideas of suicide. *Id.* She complained of persistent pain "all through my body," and said the pain increased her symptoms of depression. Tr. 284. She reported anxiety about her relationship with her ex-husband. Tr. 284.

During testing, Dr. Cole observed that Ms. Davis exhibited some problems with attention and concentration, as well as below average intellectual capacity, but that she had average immediate and delayed memory. *Id.* She displayed a tendency to give up easily on tasks, and her overall pace on tasks was slow. *Id.* There was no evidence of poor effort or inconsistency on various tasks. *Id.* On the Beck Depression Inventory II, Ms. Davis's self-reported depression symptoms revealed a score indicative of severe depression, which Dr. Cole thought inconsistent with her statement that she was currently experiencing only moderate depression. Tr. 284-85.

Ms. Davis said she lived with friends in their house. Tr. 285. She was able to attend to personal grooming and hygiene, wash dishes daily, and do laundry every two days. *Id.* She also swept and mopped once a week, although pain interfered with these chores. *Id.* She cooked daily. *Id.* She indicated that she enjoyed watching television, going to AA meetings six days a week,

going to the park, and seeing her friends at AA meetings. *Id.* Dr. Cole diagnosed Major

Depression, Recurrent; Pain Disorder Associated with Psychological Factors and a General

Medical Condition; Alcohol Dependence Claimed to be in Recent Remission; and History of

Polysubstance Dependence. *Id.* Dr. Cole concluded:

> Results of the current evaluation indicate that the client exhibits symptoms . . .
> consistent with diagnoses of: depression, and a pain disorder associated with
> psychological factors and a general medical condition. . . . Results of the current
> evaluation indicated that the client exhibited problems in the areas of attention
> and concentration. Nevertheless, she was noted to have average immediate and
> delayed memory capabilities. She also tends to give up easily on tasks, and her
> overall pace on tasks was observed to be slow. The client was able to sustain
> simple routine tasks, and no problems completing a simple multiple-step task
> were observed. From the results of the current evaluation, if the client pursues a
> vocational placement in the near future, then it is presumed that her claimed
> problems with pain, and her tendency to be at risk for further substance abuse
> under stressful conditions, would be the primary factors which would impact her
> overall level of vocational success.

Tr. 286.

On March 22, 2005, psychologist Frank Lahman, Ph.D. reviewed Ms. Davis's records on

behalf of the Commissioner and submitted a Mental RFC Assessment, in which he rated Ms.

Davis as not vocationally limited by mental impairments except for moderate limitations in the

ability to understand, remember, and carry out detailed instructions. Tr. 303-05.  On the same

date, Mary Ann Westfall, M.D., and Scott Pritchard, D.O., also reviewing Ms. Davis's medical

records on behalf of the Commissioner, submitted a Physical RFC Assessment, rating Ms. Davis

as able to lift 20 pounds occasionally and 10 pounds frequently, and stand or walk for a total of

about six hours in an eight-hour workday, with only occasional crouching and crawling. Tr. 307-

14.

Ms. Davis began treatment with Jessica and Jason Black, naturopaths, in March 2005, and continued to see them through the time of the hearing. On January 25, 2006, Hans Carlson, M.D. performed a nerve conduction study to rule out carpal tunnel syndrome as a cause of Ms. Davis's hand pain; the results of the nerve conduction study were normal. Tr. 524. Dr. Carlson wrote that Ms. Davis had Madelung's deformity[2] in her forearms and that wrist surgery was being contemplated for left upper extremity pain and intermittent paresthesias[3]. *Id.*

On August 2, 2007, Ms. Davis saw orthopedist George Zakaib, M.D., for complaints of pain in all her joints Tr. 344. Ms. Davis reported that she had tried to go back to work for the first time in five years, which had caused pain and swelling in her arms, legs, shoulders, wrists, and elbows. *Id.* Ms. Davis said she was trying to get Social Security disability for her pain. *Id.* Dr. Zakaib noted deformities at the elbows and wrists, including a prominent distal ulna bilaterally, consistent with Madelung's deformity. Tr. 345. Dr. Zakaib ordered x-rays. *Id.*

A CT scan of Ms. Davis's cervical spine done on September 24, 2007, showed congenital fusion of a right-sided C3 hemivertebra with the C2 vertebral body, resulting in cervical scoliosis; moderate right-sided degenerative arthritic findings at C4-5, with associated moderate to severe narrowing of the right C4-5 neural foramen; and a milder degree of right neural foraminal narrowing at C5-6 and C6-7. Tr. 411-12.

---

[2] Madelung's deformity is the displacement of the hand to the radial side caused by overgrowth of the ulna. *Taber's Cyclopedia Medical Dictionary* 1389 (Donald Venes, M.D., ed., 2009).

[3] Paresthesia is an abnormal or unpleasant sensation that results from injury to one or more nerves, often described by patients as numbness or as a prickly, stinging, or burning feeling. *Id.* at 1713.

On September 25, 2007, Ms. Black completed a questionnaire from Ms. Davis's attorney. Tr. 355. In Ms. Black's opinion, Ms. Davis's symptoms of arthritis, cervical radiculopathy, cervical degeneration, cervical scoliosis, dyschondrosteosis, and anxiety would be worsened by working full-time at the light or sedentary level, resulting in symptoms severe enough to interfere with attention and concentration. Tr. 357. Ms. Black opined further that Ms. Davis was incapable even of "low stress" jobs because of chronic pain. Tr. 358. Ms. Black wrote that Ms. Davis had

> degenerative changes at multiple levels of the cervical spine causing impingement of the nerves.. . . In order to relieve pain patient must find a position which lessens neurological compression. The nerve impingement effects [sic] both arms.

Tr. 358. Ms. Black assessed Ms. Davis's maximum ability to stand and walk at about three hours in an eight-hour day, and to sit at about two hours during an eight-hour day, so long as she could shift at will from sitting to standing or walking. Tr. 359. Ms. Black attributed these limitations to muscle spasms "as a result of nerve compression," with the pain of the muscle spasms causing stiffness. *Id.* Ms. Black wrote, "Any use of the postural muscle such as with sitting and standing will aggravate her symptoms." *Id.* Ms. Black considered Ms. Davis completely unable to twist, stoop, bend, crouch, climb stairs, or climb ladders, and, because of pain caused by "cervical disc degeneration affecting nerve conduction," found her limited in the ability to reach overhead, push, pull, or engage in gross manipulation with her hands. Tr. 360.

On November 7, 2007, Ms. Davis was examined by Jung Yoo, M.D. Tr. 363. Ms. Davis's chief complaint was pain in the neck and in both shoulders and arms, present for many years. *Id.* Ms. Davis reported that the pain was moderate to severe and constant, made worse with looking up, looking down, turning her head, and engaging in any activity. *Id.* She described numbness

Opinion and Order, Page 8

and paresthesia, but no weakness. *Id.*

Upon examination, Dr. Yoo found limited range of motion and tenderness, but no muscle spasm. Motor examination showed no significant loss of motor strength; intact light touch; normal reflexes; palpable radial pulses bilaterally; and good capillary refill. *Id.* Dr. Yoo noted that CT scan showed congenital hemivertebrae at C3, but no canal stenosis. *Id.* Dr. Yoo diagnosed degeneration due to congenital hemivertebrae and scoliosis, but "not a dangerous condition." *Id.* Dr. Yoo did not believe the problem had a surgical solution. *Id.*

On January 21, 2008, x-rays and an MRI of the cervical spine revealed fusion of the right-sided C3 hemivertebra to the C2 vertebral body; scoliosis of the cervical spine; and osteoarthritis of the cervical spine. Tr. 520-22. There was some mild narrowing at the C4-5 neural foramen on the right, but the radiologist found "overall no convincing evidence of nerve root impingement or significant central canal stenosis." Tr. 521. On March 20, 2008, Sandra Camacho, M.D., wrote Ms. Davis a prescription for medical marijuana to alleviate joint pain. Tr. 531.

**B.    Hearing testimony**

Ms. Davis testified that because of pain in her back and neck, she was unable to sit for more than 10 minutes before needing to stand. Tr. 572. She said she could stand for about half an hour before needing to sit down, and walk 10 or 15 minutes. Tr. 573. After walking for 10 or 15 minutes, she felt weak and tired. *Id.* She could comfortably lift about five pounds. *Id.* Ms. Davis testified that she had "lost a lot of strength" in her hands, so that she could not maintain her grip on objects, including a pencil after writing for about 10 minutes. Tr. 574. Ms. Davis said her doctor had told her to walk at least 20 minutes a day, but she was not doing it because of pain.

Tr. 575. She was currently using the opioids fentanyl and oxycodone, along with medical marijuana, for pain and trazodone for sleep. *Id.* Ms. Davis explained that her naturopaths had prescribed the drugs for her, and that she saw naturopaths because "I can't get anywhere with regular doctors." Tr. 576. Even these drugs did not work for her pain about 10% of the time. Tr. 600. She was not receiving any mental health care, and did not experience side effects from medication except anxiety. Tr. 577.

Ms. Davis described pain in her lower back, legs, and neck, with the worst pain being in her neck. Tr. 577. She rated her pain at about seven on a ten-point scale, reduced to "about a three" after taking pain medication. *Id.* Her neck problems gave her headaches "[a] couple times a week," and the headaches lasted for hours. Tr. 592. Her back pain consisted of spasms in her lower back. Tr. 587. When she bent at the waist, her back "cracks and creaks," and she needed to "bend more at my knees to take the pressure off." Tr. 598. Kneeling was difficult because her knees were tender. Tr. 599. With regard to her hands, Ms. Davis said the pain from her neck went into her arms and stiffened her hands, hindering her ability to close them. Tr. 578. She said when she used her hands on a regular basis, or for more than about an hour, "they like to claw up" and "stay in a permanent position." Tr. 579-80. Ms. Davis described her neck symptoms as "constant stiffness and pain," that affected her ability to look to the right. Tr. 581-82. She had numbness in her arms, and her feet burned and tingled. Tr. 591. Her hands and feet swelled on a daily basis. *Id.* Her legs got tired and had to pull herself along when going upstairs. *Id.* She took naps every afternoon that lasted half an hour to 45 minutes. *Id.* She also rested several times during the day for 15 minutes to half an hour. Tr. 593. She said she could be on her feet without a break for an hour or an hour and a half on a good day, but for only 10 minutes on a bad day. Tr.

596. She elevated her legs and feet every day. Tr. 597.

Ms. Davis said she began experiencing depression in 1991, but that after getting into recovery, she was using natural remedies and no longer taking antidepressants. Tr. 583. Depression, however, caused her to stay "home a lot," not even answering the phone, tr. 583, and caused difficulties with concentration and thinking. Tr. 584. She also felt "quite irritable." Tr. 587.

Ms. Davis said she worked as a volunteer office manager for AA, sitting in the office, answering the telephone, selling books to the public, and taking money to the treasurer. She was currently working two hours a day, two or three days a week, about 30 hours a month. Tr. 585-86. The previous year, she had worked "closer to 20 to 30 hours a week." *Id.* She previously attended AA meetings every day, but was now down to about two or three a week. Tr. 594. She also shared housework with her roommates, and gardened until 2007. Tr. 594. Pushing and pulling objects such as a vacuum cleaner made her back and legs tired. Tr. 599.

The ALJ called a vocational expert ("VE"), Kay Wise. The ALJ asked the VE to consider an individual able to stand and walk no more than two hours in an eight-hour day; sit for six hours in an eight-hour day; and lift 10 pounds occasionally and five pounds frequently. She was precluded from overhead reaching, could climb ramps and stairs only occasionally, and could push or pull with the upper extremities only occasionally. Tr. 602-03.

The VE responded that such a person could perform two unskilled sedentary jobs: stationary cashier, Dictionary of Occupational Titles ("DOT")[4] 211.462.010 and table worker,

---

[4]DOT is a publication of the United States Department of Labor that gives detailed requirements for a variety of jobs. The Social Security Administration has taken administrative notice of the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1153 n. 8 (9th Cir. 2007). *See* United

DOT 739.687-182; and one unskilled light duty job, office helper, DOT 239.567-010. The ALJ asked if any of the jobs would be ruled out for an individual who could not use her hands constantly for fine and gross manipulation. Tr. 604. The VE responded that the job of table worker would be eliminated, but that such a person could perform the other two jobs identified, as well as the unskilled, sedentary job of optical goods visual inspector, DOT 731.684-038.[5] Asked about an individual who could use her hands only occasionally, but not frequently, the VE responded that such a limitation "would reduce numbers significantly." Tr. 605.

Ms. Davis's attorney asked the VE to consider a person who, in addition to the impairments named in the ALJ's hypothetical, was able to stand and walk only about three hours out of an eight hour day; able to sit for five minutes before changing position and stand for five minutes before changing position; required to get up and stand or walk for about 30 minutes "about every half hour," and shift position at will among sitting, standing, and walking; lie down at unpredictable intervals during a workday; was completely precluded from twisting, stooping, crouching, and climbing stairs or ladders; was able to carry things of "nominal weight, probably less than a pound;" and was likely to be absent from work more than four times a month. Tr. 606. In response to this question, the ALJ agreed that an individual with such limitations would be unemployable. Tr. 606.

_____

States Department of Labor, DOT (4th ed. 1991), available at www.occupationalinfo.org/contents.html. The Social Security Administration relies "primarily on the DOT" for "information about the requirements of work in the national economy" at steps four and five of the sequential evaluation process.  SSR 00-4p, 2000 WL 1898704 *2 (SSA) (Use of vocational experts and occupational information in disability decisions).

[5] There does not appear to be a DOT occupation with the code number 731.684-038. None of the jobs listed in the 731.684 category is an unskilled job.

Ms. Davis called Roberta Brosamle and Ronnie Bucknell, her roommates. Tr. 607-08, 614. Ms. Brosamle said she had noticed that Ms. Davis's feet turned in, with one foot turning in "more and more." Tr. 608. Ms. Brosamle did not think Ms. Davis could walk more than a block without stopping to rest. Tr. 609. According to Ms. Brosamle, when Ms. Davis had worked the previous summer building and filling boxes, she "would come home, and her hands would be like claws." Tr. 609. "[I]t would take approximately an hour for her to massage them out, and they'd be swollen." *Id.* Ms. Brosamle could see that Ms. Dais was in pain "[p]robably 80 percent" of the time, from looking at her face and eyes. *Id.* Ms. Brosamle said that when Ms. Davis was cooking, she could work without a break for half an hour on a good day, but only five minutes on a bad day. Tr. 610. Ms. Brosamle estimated that Ms. Davis had good days "[h]alf the time." Tr. 611. Ms. Brosamle believed Ms. Davis to be depressed because she cried "at least once a week." Tr. 612. She had also observed that Ms. Davis forgot things on a bad day. Tr. 613.

Mr. Bucknell testified that Ms. Davis was ready to rest after walking a block. Tr. 615. He corroborated Ms. Brosamle's testimony that after Ms. Davis tried working, she came home with her hands "in a claw position," and that she would have to massage her hands for an hour to get them "back to where they were." Tr. 616. He thought she seemed to be in pain "80 percent of the time," and that even something "as simple as vacuuming" would wear her out. *Id.* When Ms. Davis was having a bad day, she seemed to have a hard time remembering things. Tr. 619.

Ms. Davis's attorney then asked the VE to consider the ALJ's original hypothetical, but with the additional limitations of (1) being able to walk on a level surface for about one block; (2) needing to rest after every activity, for whatever time the activity lasted; (3) the ability to

Opinion and Order, Page 13

work at a pace 20% of normal, about half the time; (4) crying spells one to three times a week,

lasting for up to 15 minutes, "during which time [she] would be nonfunctional; (5) anger

episodes one to three times a week, during which the person would raise her voice; and (6)

occasional lapses in memory and concentration. The VE responded that such a person would be

unable to sustain competitive employment. Tr. 619-20.

## C.    The Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether

a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,

416.920. At step one, the Commissioner determines whether the claimant has engaged in any

substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner

proceeds to step two, to determine whether the claimant has a "medically severe impairment or

combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c),

416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments
> which significantly limits your physical or mental ability to do
> basic work activities, we will find that you do not have a severe
> impairment and are, therefore, not disabled. We will not consider
> your age, education, and work experience.

§§ 404.1520(c), 416.920(c).

If the impairment is severe, the evaluation proceeds to the third step, where the

Commissioner determines whether the impairment meets or equals "one of a number of listed

impairments that the [Commissioner] acknowledges are so severe as to preclude substantial

gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or equals one of

the listed impairments, the claimant is considered disabled without consideration of age,

Opinion and Order, Page 14

education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the RFC to do other work in consideration of the claimant's age, education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**D.    The ALJ's Decision**

The ALJ found, at step two of the sequential analysis, that Ms. Davis had the following severe impairments: osteochondrodystrophy, a pain disorder associated with psychological factors and a general medical condition, depressive disorder, and alcohol dependence in reported remission. Tr. 20. The ALJ acknowledged that Ms. Davis had been diagnosed with bilateral Madelung's deformity of the wrists, but found no significant limitation as a result. Tr. 21. The ALJ noted that Ms. Davis had reported pain symptoms, but found that "the clinical evidence did not support her assertions:" an EMG of the left upper extremity showed no nerve impingement, carpal tunnel syndrome, or ulnar neuropathy. *Id.*

With respect to other mental symptoms, Ms. Davis had reported ongoing anxiety-related symptoms, but the ALJ found this report not corroborated except by Ms. Black, who is not a medically acceptable source under 20 C.F.R. 404.1513(a) and 416.913(a). *Id.*  The ALJ noted that in a medical record from Sheridan Medical Center, anxiety was listed as a condition, but under the heading "Chronic and Past Problems," tr. 274, while other treatment notes from Sheridan Medical Center did not establish anxiety as a medically determinable impairment.

Tr. 22.  While Dr. Camacho indicated anxiety when approving Ms. Davis for medical marijuana, the ALJ found "no indication that a mental assessment occurred." *Id.*

At step three, the ALJ considered whether Ms. Davis's impairment met Listing 1.04, and concluded that it did not because despite spinal abnormalities consistent with osteochondrodystrophy, there was "no medical evidence of record that revealed neurological deficits" and medical records showed that Ms. Davis ambulated effectively and exhibited no evidence of fine or gross motor loss. *Id.* The ALJ noted that the reviewing psychologists, Frank Lahman and Bill Hennings, found no restriction in activities of daily living and maintaining social functioning, and only moderate difficulties maintaining concentration, persistence and pace. *Id.* The ALJ found these opinions "supported by the overall record" and adopted them. *Id.* The ALJ found that Ms. Davis attended to self-care regularly and independently, including dressing and feeding herself; cooked, cleaned, shopped, and helped care for her two children; regularly attended AA meetings and spent time with friends; shared a house with friends; watched television, did laundry every two days, and swept and mopped once a week, as well as taking the bus to AA meetings six days a week. *Id.*

The ALJ found Ms. Davis's testimony not credible on the intensity, persistence, and limiting effects of her symptoms because: (1) despite an alleged onset date of September 30, 2001, and medical care for transient symptoms before 2003, Ms. Davis did not seek regular medical care for chronic pain and mental symptoms until the latter half of 2003; (2) Ms. Davis's reports of total body pain were inconsistent with clinical findings, including a 2008 MRI of the cervical spine revealing no evidence of nerve root impingement or significant central stenosis; (3) despite Ms. Davis's reports of left upper extremity paraesthesias, testing was normal, with

Dr. Carlson finding no electrophysiologic evidence of left ulnar neuropathy; (4) despite

Ms. Davis's reports of persistent leg pain and inability to move her feet, Dr. Collins observed a

normal gait and noted good strength, and in May 2005, Ms. Davis's physical examination was

essentially normal, showing normal heel to shin and heel to toe walking, intact sensation, range

of motion in the neck, low back, arms, legs, hips, ankles, and feet within normal limits, normal

reflexes in the biceps, triceps, patella, and Achilles tendon, with November 2005 and September

2006 reports showing the same findings as 2005; (5) Ms. Black had urged Ms. Davis to do light

exercise daily; (6) in November 2007, Ms. Davis told Ms. Black her pain symptoms were well

managed, but when she met with Dr. Yoo, less than a week later, she alleged constant pain in her

shoulders, arms, and neck that she rated as moderate to severe, gradually worsening, and

accompanied by numbness and paresthesia, although Dr. Yoo observed her to be in only mild

discomfort; (7) in March 2005, Dr. Magaret observed Ms. Davis to ambulate and climb on and

off the examination table without difficulty, and to have normal bulk, tone, and strength in her

upper and lower extremities, as well as a normal sensory and reflex examination; (8) Ms. Davis

had failed to follow through with the treatment advice to exercise, admitting at the hearing that

she got no exercise at all; and (9) Ms. Davis had stopped taking antidepressants and did not

engage in mental health counseling, despite her testimony that she was experiencing depression.

The ALJ also found Ms. Davis's symptom testimony inconsistent with her testimony that for two

years after her alleged onset date, she volunteered up to 30 hours per week as the AA Intergroup

office manager in her community, and remained still capable of 30 hours a month.

    The ALJ concluded that Ms. Davis had the ability to perform less than the full range of

sedentary work, standing and walking for two hours out of an eight-hour workday; sitting for six

Opinion and Order, Page 17

hours; lifting "10 pounds frequently and 5 pounds occasionally," and occasionally pushing or pulling with the upper extremities.[6] Tr. 23. She could not, however, perform overhead reaching or climb ladders, ropes, or scaffolds. She could occasionally climb ramps and stairs, crouch, stoop, and crawl. She could use her hands for fine and gross manipulation frequently but not constantly. She was limited to unskilled work "consistent with jobs identified in the [DOT] as having an SVP of 2.[7]

The ALJ considered the opinion of Dr. Magaret, who had found Ms. Davis capable of standing and walking for six hours of an eight-hour workday and sitting without restriction, as well as carrying 20 pounds occasionally and 10 pounds frequently. Tr. 26. The ALJ gave some weight to these findings, but gave Ms. Davis "some benefit of the doubt in determining a somewhat more restrictive residual functional capacity." Tr. 26. The ALJ also considered the medical opinions of reviewing physicians Scott Pritchard, D.O. and Mary Ann Westfall, M.D., who found Ms. Davis capable of light work, but with postural limitations less restrictive than those found by the ALJ. Tr. 26-27. The ALJ gave their findings "only some weight" for the "same reasons accorded to Dr. Magaret. Tr. 27. The ALJ gave significant weight to Dr. Cole's opinion that Ms. Davis was capable of sustaining simple, routine tasks, finding it supported by

---

[6] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. §§ 404.1567(a), 416.967(a).

[7] SVP stands for Specific Vocational Preparation, which is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT Appendix C, available at http://www.occupationalinfo.org/appendxc_1.html#II. An SVP of one or two means that a job requires preparation of up to one month. *Id.*

Ms. Davis's demonstrated capacity for unskilled work during the two years she did volunteer work for AA. *Id.*

The ALJ considered the statements of Ms. Black as lay witness testimony. *Id.* The ALJ noted that Ms. Black had said in a July 2005 letter that Ms. Davis could not lift heavy objects and had worsening symptoms with prolonged sitting, standing or walking, but that she had adequate understanding and mental comprehension skills except for social anxiety. The ALJ accepted all of Ms. Black's statements except for the comment about social limitations, finding it not supported by the record, including Ms. Davis's own admissions: she shared a house, attended support groups regularly, could take public transportation, could do volunteer work that entailed interacting with others. *Id.*

The ALJ rejected Ms. Black's statement that Ms. Davis was "incapable of even low stress jobs," finding it contradicted by "the significant period of work activity in which Ms. Davis volunteered as the AA Intergroup office manager." *Id.* The ALJ took note of the statements by Ms. Brosamle and Mr. Bucknell that Ms. Davis cried frequently and had concentration problems and low motivation, but concluded that their testimony spoke only to "a recent exacerbation of a depressive condition which was so dormant that Ms. Davis ceased any form of treatment for it." Tr. 28. The ALJ noted further that Ms. Davis was able to handle the activities of daily life without assistance, had previously been very active in AA and had reduced her volunteer hours only recently, "with no associated increase in clinical findings or impetus to seek mental health care." Tr. 28.

At step four, the ALJ found that Ms. Davis was unable to perform any past relevant work. Relying on the VE's testimony, the ALJ found at step five that Ms. Davis was capable of

Opinion and Order, Page 19

performing the jobs of Cashier 2, DOT 211.462-010 (sedentary, unskilled); Office Helper, DOT

239.567-010 (light, unskilled) and Optical Goods Inspector, DOT 731.684-038 (sedentary,

unskilled). The ALJ noted that the exertional level for Office Helper in the DOT indicated that it

was light work, and was therefore inconsistent with the ALJ's hypothetical, but found a

"reasonable explanation for the discrepancy" in the VE's explanation that the job was last

updated in the DOT in 1981, and was currently performed at the sedentary level. Tr. 29.

### III.  STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards

and the findings are supported by substantial evidence in the record. *Meanel v. Apfel*, 172 F.3d

1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th

Cir. 1995). In determining whether the Commissioner's findings are supported by substantial

evidence, the court must review the administrative record as a whole, weighing both the

evidence that supports and the evidence that detracts from the Commissioner's conclusion.

*Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be

upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews,* 53

F.3d at 1039-40.

### IV.  DISCUSSION

**A.    Alleged error in failure to obtain opinion of medical expert at step three**

Step three of the sequential analysis requires the ALJ to consider the severity of a

claimant's impairment by comparing the impairment to those listed in Appendix I of the Social

Security regulations ("the Listings"), 20 C.F.R. Part 404, Subpt. P, App. 1. The Listings describe

Opinion and Order, Page 20

impairments of each major body system which are considered severe enough to prevent a claimant from performing any gainful activity. The Listings contain medical criteria only, describing the "symptoms, signs and laboratory findings" that make up the characteristics of each listed impairment. 20 C.F.R. §§ 404.1525(c), 416.925(c). Each impairment has one or more components, and for each component the Social Security Administration has prescribed a certain degree of intensity that the Administration considers sufficiently serious to constitute disability. To meet a Listing, the claimant's impairment must satisfy all of the components of the Listing.

Ms. Davis asserts that the ALJ erred at step three by failing to evaluate whether she met Listings 11.00C or 11.04B, in light of Ms. Black's opinion that she met these Listings because she suffered from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Tr. 358. The argument is unpersuasive. The ALJ correctly rejected Ms. Black's medical opinion because Ms. Black is not an acceptable medical source, and therefore not competent to give an opinion on whether Ms. Davis meets the medical criteria for a listed impairment. No acceptable medical source offered an opinion on either of these Listings.

If a claimant suffers from multiple impairments and none considered alone meets a Listing, the collective symptoms, signs, and laboratory findings of all the claimant's impairments may be evaluated to determine whether they are equivalent to a Listing. *Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cr. 1990). Any decision on whether a claimant's impairment or impairments are medically equivalent to an a listed impairment must be based on medical evidence. 20 C.F.R. § 404.1520(d). *See also* SSR 86-8, 1986 WL 68636 (S.S.A.).

Opinion and Order, Page 21

The ALJ is not, however, required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination *unless the claimant presents evidence in an effort to establish equivalence.  Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001); *Burch*, 400 F.3d at 683. (Emphasis added). With the exception of Ms. Black's opinions, Ms. Davis has not presented such evidence.

Ms. Davis argues further that the ALJ's findings are insufficient to show that she considered the Listings or evaluated Ms. Davis's impairments under them because she did not call a medical expert. The argument that the ALJ's findings are insufficient is disposed of in *Lewis v. Apfel,* 236 F.3d 503 (9th Cir. 2001), where, as in this case, the ALJ identified the claimant's impairments and then concluded that "[claimant] does not have an impairment or combination of impairments listed in or medically equal to one listed in the regulations." *Id*. at 512. In *Lewis*, as here, the claimant argued that the ALJ erred by failing to elaborate on this determination. *Id.* at 512, 514. The court held that the ALJ had sufficiently analyzed the evidence in the portion of the opinion setting out the evidence in the case. *Id.* at 513. That is what the ALJ did here as well.

Ms. Davis is mistaken in her argument that the ALJ was required to call a medical expert. Nothing in the regulations *requires* the ALJ to call a medical expert to make the step-three determination. ALJ's*"may* ask for and consider opinions from medical experts," 20 C.F.R. § 404.1527(f)(2)(iii). *See also* 20 C.F.R. § 416.927(e)(2) ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of [the Listing] . . . the final responsibility for deciding these issues is reserved to the Commissioner."). The use of the word "may" demonstrates that the ALJ is not under a duty to

call a medical expert before making a determination at step three.

Accordingly, I find no error by the ALJ here.

**B.    Credibility findings**

Claimants' statements about pain or other symptoms will not alone establish disability; there must be clinical signs such as laboratory findings or diagnoses that show the claimant has a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence, including statements about the intensity and persistence of the pain or other symptoms, would lead to a conclusion of disability. 20 C.F.R. §§ 404.1529, 416.929. Once the claimant has produced medical evidence of the existence of an underlying impairment that is reasonably likely to cause the alleged pain or other symptom, medical findings are not required to support the alleged severity of the pain or other symptoms. *Bunnell v. Sullivan*, 947 F.2d 1341, 1345 (9th Cir. 1991) (*en banc*); SSR 96-7p, 1996 WL 374186 (S.S.A.) (pain testimony may establish greater limitations than medical evidence alone). *But see Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his or her credibility analysis).

Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's subjective testimony must be clear and convincing. *Burch*, 400 F.3d at 680. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Holohan v. Massinari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

Several of the ALJ's credibility findings were based on the absence of clinical evidence for the existence of an underlying impairment reasonably likely to cause Ms. Davis's alleged symptoms of loss of strength, numbness, paresthesias, and an inability to grip with her hands; persistent leg pain and an inability to move her feet or walk for more than 10 minutes; constant pain in her shoulders, neck, and arms; and debilitating depression and fatigue. The record contains substantial medical evidence to support these findings, including Dr. Magaret's observation in 2005 that Ms. Davis's coordination, station, and gait were normal, that he was unable to reproduce any tenderness along her lower extremities, and that she was capable of full range of motion throughout all extremities without pain; the normal nerve conduction study in January 2006; Dr. Yoo's 2007 findings on physical examination of no muscle spasm, no loss of motor strength, intact sensorium, intact reflexes, palpable radial pulses on both sides, and good capillary refill, as well as his interpretation of Ms. Davis's CT scan as showing no canal stenosis; and the x-rays and MRI of the cervical spine in January 2008 showing no convincing evidence of nerve root impingement or significant central canal stenosis. The court concludes that the ALJ's credibility findings, which identify the testimony found to be unconvincing and the medical evidence that undermines it, are clear and convincing. *See, e.g., Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (holding that absence of objective medical evidence to support claimant's descriptions of pain and limitations were clear and convincing reasons for rejecting testimony).

Additionally, the ALJ found Ms. Davis's symptom testimony inconsistent with her ability to work nearly full-time as a volunteer in the AA office for a period of two years, and her continuing ability to perform that volunteer work for 30 hours a month. The ALJ noted further

that Ms. Davis had not followed her naturopath's recommendation that she engage in light exercise, and had not sought treatment–whether medication or therapy–for the alleged exacerbation of her depression.

These findings are also clear and convincing. *See, e.g., Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that clear and convincing reasons include medical noncompliance, inconsistencies in claimant's testimony or between testimony and conduct, and daily activities inconsistent with the alleged symptoms). Accordingly, I find no error by the ALJ.

## C.    Alleged error in failure to give proper weight to opinions of naturopath

Ms. Davis argues that the ALJ erred in giving Ms. Black's opinion the same consideration given the testimony of a lay witness, arguing that Ms. Black's opinions should have been evaluated as a medical opinions.

Under 20 C.F.R. § 404.1513, only an "acceptable medical source" can establish a medically determinable impairment. Acceptable medical sources are: licensed physicians, whether medical or osteopathic doctors; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. *Id.* at (a). The regulation provides that the Commissioner may also consider evidence from "other sources," including, but not limited to: medical sources not listed at § 404.1513(a), such as nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists; educational personnel; public and private social welfare agency personnel; and other non-

Opinion and Order, Page 25

medical sources such as spouses, parents, caregivers, siblings, relatives, friends, neighbors and clergy. *Id.* at (d)(1)-(4). Section 404.1513(d) (1)-(4) does not suggest a distinction between non-acceptable medical sources and non-medical sources such as lay witnesses.

Ms. Davis argues that the ALJ should have evaluated Ms. Black's testimony under 20 C.F.R. § 416.927 (d), which provides, "Regardless of its source, we will evaluate every medical opinion we receive." While the reference to "medical opinion" could, as Ms. Davis argues, be construed to mean opinions from both acceptable and non-acceptable medical sources, 20 C.F.R. § 416.927(a)(2) precludes such a construction: "Medical opinions are statements from physicians and psychologists or *other acceptable medical sources* that reflect judgments about the nature and severity of your impairment(s) . . . ." (Emphasis added). Ms. Black is a non-acceptable medical source; her opinions therefore do not qualify as "medical opinions." The ALJ did not err in considering Ms. Black's testimony under the standard applied to a lay witness.

Ms. Davis also argues that the ALJ failed to give sufficient reasons for rejecting Ms. Black's opinions, arguing that although the ALJ accepted Ms. Black's July 2005 statement that Ms. Davis's symptoms worsened with prolonged sitting, standing, or walking because it was consistent with the medical record, the ALJ nonetheless found that Ms. Davis could perform sedentary work, which by definition would not accommodate a difficulty with prolonged sitting.

Ms. Davis has both mischaracterized and attempted to give too much weight to Ms. Black's July 2005 statement. Even if Ms. Black were an acceptable medical source, the opinion at issue is merely a check mark in a box marked "yes," to a question posed by Ms. Davis's attorney. Such unexplained, "check the box" opinions are entitled to little weight. *See, e.g., Holohan,* 246 F.3d at 1202 and 20 C.F.R. § 404.1527(d).

Opinion and Order, Page 26

The question asked was:

> 11.    Is it likely that one or more of the claimant's health problems
>        would be made worse if the claimant was working full time, eight
>        hours a day, at the light or sedentary levels of exertion?

The question does not ask whether prolonged sitting, standing, or walking would cause Ms. Davis's symptoms to become worse and even if it did, Ms. Black's opinion is entitled to little weight because it is not from an acceptable medical source and is not explained.

Ms. Davis also challenges the ALJ's rejection of Ms. Black's September 25, 2007 opinion on the basis of Ms. Davis's ability to volunteer with her AA group. Ms. Davis argues that she described the requirements of the volunteer work as "waiting to see if someone comes in," selling them books, answering the phone, and taking money to the treasurer, and that this description does not establish how long Ms. Davis had to sit, stand, walk, reach or lift.

The argument is unpersuasive. Ms. Black's opinion of September 25, 2007 was that Ms. Davis was "incapable of even low stress jobs" because of pain. Neither Ms. Black's opinion nor Ms. Davis's testimony goes to Ms. Davis's ability to sit, stand, walk, reach, or lift. The ALJ rejected Ms. Black's opinion that Ms. Davis was "incapable of even low stress jobs" because she had demonstrated the ability to perform the volunteer work. Accordingly, the ALJ's finding on this issue is not erroneous.

## D.    Step five analysis

Ms. Davis argues that under the ALJ's finding that she was only able to perform sedentary work, and that she cannot perform any of the jobs identified by the VE: Cashier II, because the DOT defines it as a light, not sedentary, job; Office Helper, also defined in the DOT as a light job; and Optical Goods Inspector, a job that does not exist under the DOT Code the VE

Opinion and Order, Page 27

provided.

The best source for how a job is generally performed is usually the DOT. *Pinto v. Massanari*, 249 F.3d 840, 845-46 (9th Cir. 2001). For an ALJ to accept vocational expert testimony that contradicts the DOT, the record must contain "persuasive evidence to support the deviation." *Tommasetti*, 533 F.3d at 1042 (9th Cir. 2008); *Pinto,* 249 F.3d at 846. Such evidence includes available job data and a claimant's specific limitations. *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).

The VE characterized Cashier II as a sedentary job, despite its being identified in the DOT as a light job, without any explanation of the deviation. The VE acknowledged that Office Helper was a light job, but explained the inconsistency with the statement that the job definition had last been updated in 1981 and there were "now listed in Oregon about 4,100 positions as office helper, unskilled, sedentary." Tr. 604. The VE did not explain how or why the date of the last update affected the exertion level of the job, or identify the source for her information about the number of sedentary office helper jobs. Such indefinite testimony is not persuasive evidence to explain a conflict with the DOT. *Tommasetti*, 533 F.3d at 1042.

When a VE provides information about the requirements of an occupation, the ALJ has an affirmative duty to determine whether the information conflicts with the DOT and to obtain an explanation for the apparent conflict. *Massachi,* 486 F.3d at 1152-53. The ALJ must resolve the conflict, and make findings about how the conflict was resolved, before relying on the testimony to find that a claimant is not disabled. *Id.*; SSR 00-4p, 2000 WL 1898704 (S.S.A.). The ALJ failed to comply with that duty here. When there is an apparent conflict between the DOT and the VE's testimony, and no basis for the VE's deviation, the court cannot determine

whether substantial evidence supports the step five finding. *Massachi*, 486 F.3d at 1154 & n. 19.

As previously noted, the DOT does not appear to contain an entry for a job identified with the number 731.684-038. The Commissioner argues that the VE and the ALJ inadvertently transposed the first two digits of DOT 713.684-038, which fits precisely within the VE's description of an unskilled, sedentary job. Def.'s Mem. p. 18, n. 6. The argument is unavailing because there is no entry for DOT 713.684-038 either. The DOT does identify an unskilled, sedentary job with the number 713.667-010, but no evidence supports an inference that the VE meant to identify this job.

The ALJ erred at step five by accepting testimony from the VE that conflicted with both the ALJ's RFC of sedentary work and the DOT, without an explanation for the conflict. It is not necessary for the court to consider Ms. Davis's additional step five argument that the VE's testimony was inconsistent with the ALJ's limitation to unskilled, simple, repetitive work.

## V. CONCLUSION

The Commissioner's decision is reversed and remanded for further administrative proceedings at step five of the sequential analysis.                     .

IT IS SO ORDERED.

Dated this 7th day of December, 2011.

                                   /s/ Michael H. Simon
                                   Michael H. Simon
                                   United States District Judge